IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NITIN AGRAWAL ) <br> 10171 Mosby Woods Drive, Apt. 102 ) <br> Fairfax, VA  22030 ) <br> ) <br> ) <br> Plaintiff, ) <br> ) Civil Case No: <br> v. ) <br> ) <br> GEORGE MASON UNIVERSITY, ) <br> 4400 University Drive ) JURY DEMAND INCLUDED <br> Fairfax, VA  22030 ) <br> ) <br> ) <br> Defendant. ) | |

## COMPLAINT

Plaintiff Dr. Nitin Agrawal, by counsel, moves this Court for entry of judgment in his favor, and against Defendant George Mason University (GMU), and in support of such Complaint, alleges and avers as follows:

## NATURE OF ACTION

George Mason University discriminated against Dr. Agrawal by retaliating against Dr. Agrawal for the protected activity of supporting and assisting in a minority colleague's claim of wrongful censure, unlawful discrimination, and retaliation because of her race, national origin, and sex. In retaliation for Dr. Agrawal's protected activity, GMU intentionally violated the terms of Dr. Agrawal's employment contract and GMU's own tenure review procedures, in denying Dr. Agrawal's application for tenure and terminating Dr. Agrawal's employment, and GMU continues to retaliate against Dr. Agrawal for his protected activity.

# INTRODUCTION

Dr. Agrawal was hired by GMU as an Assistant Professor in the Department of Bioengineering in August 2012, and was employed continually on a full-time basis until his termination on May 24, 2019, where he was focusing on the research and development of cancer treatments. In February 2018, a female colleague of Dr. Agrawal's, Dr. Carolina Salvador Morales, who was employed as an Associate Professor of Bioengineering at GMU, filed a grievance against several GMU administrators and faculty members, and ultimately filed a charge of racial and sexual discrimination with the EEOC. Dr. Agrawal was identified as a key witness in these investigations, and he voluntarily provided information and testimony in support of Dr. Salvador Morales' claims. For this protected activity, GMU retaliated against Dr. Agrawal by wrongfully and unlawfully denying Dr. Agrawal's application for tenure and terminating Dr. Agrawal, among other discrete acts of retaliation that continue to this day.

# PARTIES

1. Plaintiff, Dr. Nitin Agrawal ("Dr. Agrawal" or "Plaintiff") at all times material hereto was and is a resident of the Commonwealth of Virginia. At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. §2000e(f).

2. Defendant, George Mason University ("GMU" or "Defendant") is a Virginia state university operating in the Eastern District of the Commonwealth of Virginia and elsewhere. Defendant is an "employer" within the meaning of 42 U.S.C. §2000e(b). Defendant is one of the largest academic institutions within the Easter District of the Commonwealth of Virginia.

# JURISDICTION

3. The United States District Court for the Eastern District of Virginia may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331 and

1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights. The Court also has subject-matter jurisdiction pursuant to 42 U.S.C. § 2000e-5(3)(3).

4. This Court has supplemental jurisdiction over the remaining state law claim pursuant to 28 U.S.C. § 1367 because the remaining claims are so related to the Title VII claims that they form part of the same case or controversy under Article III of the United States Constitution.

5. The Court has personal jurisdiction over Defendant because Defendant conducts business in the Commonwealth of Virginia.

6. Venue is properly laid in the Eastern District of Virginia, Alexandria Division pursuant to 28 U.S.C. § 1391(b)(2) because the events which serve as the subject of this complaint took place within the Division.

## PROCEDURAL STATUS

7. Dr. Agrawal's employment was terminated on May 24, 2019. On July 26, 2019, Dr. Agrawal timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). *See Exhibit* 1.

8. On August 14, 2020, the U.S. Equal Employment Opportunity Commission ("EEOC") issued dismissal and notice of right to sue. *Exhibit 2*.

9. This action is timely filed and all procedural prerequisites to suit have been met.

## STATEMENT OF FACTS

10. Dr. Agrawal was hired by GMU as an Assistant Professor in August 2012 and awarded Dr. Agrawal a renewed tenure-track appointment on April 15, 2016. *Exhibit 3*.

11. During his employment with GMU, Dr. Agrawal personally witnessed several instances of race and sex discrimination against his colleague Dr. Carolina Salvador Morales, including the following:

    a. Dr. Salvador Morales was sexually harassed by a GMU graduate student, and GMU's administration – including the Bioengineering Department Chair, Dr. Michael Buschmann; former Acting Bioengineering Department Chair, Dr. Brian Mark; the Dean of the Engineering School, Dr. Kenneth Ball; GMU Provost, Dr. David Wu; and GMU President, Dr. Angel Cabrera – failed to take any action to address the situation after being given notice of the ongoing harassment.

    b. The use of sexually derogatory obscenity by the Bioengineering faculty, Dr. Wilsann Joiner, in regard to Dr. Salvador Morales at an official meeting of the Department faculty.

    c. The repeated and conspicuous failure of the Bioengineering Department or Engineering School to recognize Dr. Salvador Morales' academic and research achievements.

12. In February 2018, Dr. Salvador Morales filed a formal complaint with GMU's Grievance Committee, and identified Dr. Agrawal as a potential witness.

13. On May 2, 2018, Dr. Agrawal was interviewed by GMU's Grievance Committee where Dr. Agrawal related the incidents he had personally witnessed that supported Dr. Salvador Morales' claims of harassment and derogatory allegations primarily by the Bioengineering Department Chair Buschmann, Dean Ball, and several faculty members.

14. On May 8, 2018, Dr. Agrawal was interviewed again by the Chair of GMU's Grievance Committee regarding his testimony in support of Dr. Salvador Morales' claims

against the university in which Dr. Agrawal made clear that Dr. Morales was discriminated against.

15. On May 21, 2018, GMU's Grievance Committee submitted the final report on its investigation of Dr. Salvador Morales' claims to Bioengineering Department Chair, Dr. Michael Buschmann; the Dean of the Engineering School, Dr. Kenneth Ball; and GMU Provost, Dr. David Wu.

16. The final report of GMU's Grievance Committee indicated that Dr. Agrawal had testified in support of Dr. Salvador Morales' claims and that Dr. Agrawal was, in fact, the only faculty member willing to testify that he had witnessed discriminatory behavior by GMU faculty and administration against Dr. Salvador Morales.

17. Shortly after completion of GMU's Grievance Committee's final report, Dr. Salvador Morales filed an EEOC complaint for discrimination against GMU, and again identified Dr. Agrawal as the key witness to support her claims.

18. From this point forward, GMU – through its faculty and administration members Bioengineering Department Chair, Dr. Michael Buschmann; the Dean of the Engineering School, Dr. Kenneth Ball; GMU Provost, Dr. David Wu; and GMU President, Dr. Angel Cabrera – was aware of Dr. Agrawal's testimony in support of Dr. Salvador Morales' claim of discrimination, and Dr. Agrawal's willingness to testify in support of Dr. Salvador Morales in her claims before the EEOC.

19. After GMU became aware of Dr. Agrawal's testimony, on or about July 30, 2018, the Bioengineering Department began formal review of Dr. Agrawal's application for tenure at the university.

20. GMU's tenure procedures dictate that an Assistant Professor who is not granted tenure will be terminated within a year of the tenure applicant's denial.

21. The Bioengineering Department's tenure review committee consisted of nine members of the faculty of the Bioengineering Department who reviewed Dr. Agrawal's tenure application, including Dr. Caroline Hoemann, who was married to Dr. Buschmann – whom Dr. Agrawal made specific allegations against in his testimony in support of Dr. Salvador Morales' complaint.

22. The Bioengineering Department tenure review committee (the "First Level Committee") met on September 5, 2018 and requested additional information regarding Dr. Agrawal's CV and publications, a request that Dr. Agrawal promptly responded to on September 11, 2018 by providing an updated CV and additional information regarding the publications in question.

23. Satisfied with the additional information provided by Dr. Agrawal, the First Level Committee voted on September 12, 2018, to approve Dr. Agrawal's tenure with a vote of five (5) to four (4) in favor.

24. Several of the First Level Committee voting against Dr. Agrawal's tenure expressed displeasure at the outcome, including Dr. Buschmann's spouse, Dr. Hoemann, and demanded a re-vote.

25. Dean Ball – who was also one of the primary defendants in Dr. Salvador Morales' complaints and Dr. Agrawal's testimony – approved a re-vote on the false pretext that Dr. Agrawal had not provided the additional information requested by the First Level Committee until after the initial vote, and that another vote was necessary to evaluate the additional information – which Dr. Agrawal had actually provided the day before the initial vote on

September 12, 2018. The GMU tenure review policies and procedures prohibit interference of this type from the Dean and Department Chair, and the re-vote was approved in violation of GMU's tenure policies and procedures.

26. On October 9, the First Level Committee voted again on Dr. Agrawal's tenure, and this time voted to deny Dr. Agrawal's tenure application by a vote of two (2) to six (6) against.

27. As part of Dr. Agrawal's tenure application review, Bioengineering Chari Dr. Buschmann identified and requested eight (8) independent renowned researchers – not associated with Dr. Agrawal or GMU – to submit recommendations on Dr. Agrawal's tenure approval based entirely on the strength and influence of Dr. Agrawal's public work and Dr. Agrawal's reputational influence in his field. All eight (8) of these independent evaluators unanimously recommended approval of Dr. Agrawal's application for tenure.

28. A "Second Level Committee" consisting of 10 faculty members from six different departments within the Volgenau School of Engineering at GMU also independently reviewed Dr. Agrawal's application for tenure as part of the tenure process. On November 27, 2018, the Second Level Committee voted unanimously in favor of approving Dr. Agrawal's tenure application, by a vote of ten (10) to zero (0) in favor.

29. The Second Level Committee noted in its approval of Dr. Agrawal's tenure application that it did not have clarity as to why the First Level Committee presented highly divergent votes in the two rounds of voting, and recognized the high quality of Dr. Agrawal's publications to meet the criteria of "genuine excellence" in research.

30.     On November 16, 2018 and on November 28, 2018, Dr. Agrawal informed Dr. Ball's and the Provost's office of two additional, new publications to Dr. Agrawal's credit, so that those additional publications could be considered in the application for tenure.

31.     After the Second Level Committee's vote approving tenure, the independent evaluators' unanimous recommendations for tenure, and submission of two additional publications for consideration by Dr. Agrawal; Dr. Ball, in his capacity as Dean of the School of Engineering, exercised his authority to overturn the recommendation of the Second Level Committee – specifically corroborating the First Level Committee's revote outcome that he himself had approved based on false – and advised against granting Dr. Agrawal tenure.

32.     Dr. Ball ignored the additional publications submitted by Dr. Agrawal, and the recommendations of both the Second Level Committee and the independent evaluators, and justified his decision to deny Dr. Agrawal's tenure application by stating that Dr. Agrawal had not published enough articles and papers.  This was in direct violation of GMU tenure guidelines that "The administration should overturn faculty personnel recommendations rarely, and only when it is clear that peer faculty have not applied appropriate standards". The guidelines also state "Only in extraordinary circumstances and for clearly stated reasons should administrators substitute their own judgment of the value of scholarly accomplishments for judgments made by faculty". Dr. Ball not only interfered in the First Level evaluation and approved an illegitimate revote based on false pretext, but also overturned the Second Level committee's vote without clearly justifying reasons for his contradictory judgement in contrast to the Second Level committee.

33.     Dr. Ball, in violation of GMU's explicit policies regarding transmittal of tenure review letters, prohibited Dr. Agrawal access to his letter recommending denial of tenure for

almost two months after submitting the recommendation to GMU's Provost and President, thus denying Dr. Agrawal the ability to respond to the content of Dr. Ball's recommendation.

34. Dr. Wu and Dr. Cabrera, acting as GMU's Provost and President, respectively, accepted Dr. Ball's recommendation to deny tenure, and subsequently officially denied Dr. Agrawal's application for tenure, also without providing justification for overturning the Second Level Committee's unanimous recommendation in favor of tenure.

35. As a result of the denial of Dr. Agrawal's application for tenure, Dr. Agrawal was terminated from GMU on May 24, 2019.

36. While employed at GMU and prior to the denial of his tenure application, Dr. Agrawal published numerous articles and research papers as a primary researcher, and has received research grant from the U.S. Government of over $982,000.

37. As a comparator, Dr. Qi Wei was an Assistant Professor in the GMU Bioengineering Department applying for tenure at about the same time period as Dr. Agrawal. Dr. Wei had also published several articles and research papers, but was credited as a secondary researcher working under mentorship her former mentor on several of those publications. According to GMU tenure policies and procedures, such publications secondary publication credits hold little significance towards research productivity during tenure-track period. Dr. Wei's publication citations, one of the factors used to gauge scholarly impact, were significantly lower – less than 300 as compared to over 1,000 citations for Dr. Agrawal's work. Dr. Wei had also applied for a research grant from the U.S. Government, but her total amount of grant funding was also significantly lower than Dr. Agrawal at the time of her review. At the time of his tenure application review, Dr. Agrawal was objectively more qualified than Dr. Wei for the approval of tenure in GMU's Bioengineering Department.

38. GMU has retaliated and continues to retaliate against Dr. Agrawal by means that go beyond Dr. Agrawal's tenure denial and subsequent termination.

39. Dr. Buschmann falsely reported that several items were missing and unaccounted for in Dr. Agrawal's laboratory shortly before Dr. Agrawal was terminated, in an attempt to damage Dr. Agrawal's reputation before departing GMU by accusing Dr. Agrawal of theft.

40. Prior to Dr. Agrawal's termination from GMU, Dr. Buschmann compelled one of Dr. Agrawal's doctoral mentees (Daud Khan) to transfer his research to another professor within the Bioengineering Department. Dr. Agrawal objected to this transfer and volunteered to continue acting as the doctoral student's mentor even after leaving GMU, because a transfer of the student's research to another faculty member would amount to plagiarism and a theft of Dr. Agrawal's work. Regardless of Dr. Agrawal's objections and the damage that Dr. Agrawal would inevitably suffer as a result, Dr. Buschmann compelled Dr. Agrawal's mentee to relocate his research with the promise of continued salary and a premature PhD degree from GMU.

41. Just prior to Dr. Agrawal's termination, Dr. Buschmann requested Dr. Agrawal's student to inventory his laboratory material, however, used this information solely to frame Dr. Agrawal for theft while allowing damage to frozen biological research material worth over $10,000. Dr. Buschmann also claimed numerous of Dr. Agrawal's laboratory items to be moved to his own lab.

42. After Dr. Agrawal's termination, GMU utilized its authority to transfer one of Dr. Agrawal's federal grants worth approximately $430,000 to the only faculty within the Bioengineering Department, whom Dr. Buschmann had recruited under his Chairmanship. This faculty neither had established experience in the associated field nor was involved in the project idea conceived by Dr. Agrawal.

43. After Dr. Agrawal's termination, the Associate Dean from the Dean's office wrongfully contacted one of Dr. Agrawal's potential employers in retaliation (without Dr. Agrawal's permission) and subsequently informed Dr. Agrawal that he was not going to receive an employment offer from that institution. Notably, at this time, Dr. Agrawal was still in negotiations with this institution and had not received a rejection.

44. Since Dr. Agrawal's termination from GMU, Dr. Agrawal has transferred his research and Federal grants to his new employer, Children's National Hospital, in Washington, D.C., but GMU refuses to timely transfer over $100,000 dollars of research equipment and supplies that Dr. Agrawal purchased with grant funds to his lab at Children's National Hospital. This transfer of grant-purchased equipment is explicit in the terms of any research grant, and routine upon transfer of personnel from one organization to another – yet, in over six months of requests by Dr. Agrawal and Children's National Hospital, GMU has refused to take reasonable steps to secure and transfer the grant property.

45. Dr. Agrawal was denied tenure and terminated in retaliation for his support of a colleague's discrimination claims against GMU, and most particularly in retaliation for accusations Dr. Agrawal made against Dr. Buschmann, the Chair of the Bioengineering Department and Dean Ball in his testimon.

46. GMU's handling of Dr. Agrawal's tenure application review violated GMU's own policies and procedures on tenure review, and thus violated Dr. Agrawal's employment contract with GMU.

47. As a direct and proximate result of GMU's unlawful actions, Dr. Agrawal has suffered damages in the form of lost salary, lost benefits, long-term professional reputational

harm, loss of scientific progress in his research, financial loss, mental anguish, and other compensatory and consequential damages.

### COUNT I – Retaliation in Violation of Title VII, Civil Rights Act of 1964

48. Paragraphs 1 through 47 above are hereby incorporated and restated herein.

49. As described above, on at least two occasions, Dr. Agrawal testified in support of a colleague's discrimination claims against GMU as part of GMU's formal grievance reporting process, and stood willing to testify against GMU before the EEOC on the same subject matter.

50. GMU retaliated against Dr. Agrawal by repeatedly violating GMU's own policies and procedures on tenure review, for the intended result of denying Dr. Agrawal's tenure application and subsequently terminating Dr. Agrawal's employment with GMU.

51. In addition to the tenure denial and termination, GMU continues to retaliate in other, more petty, ways by poaching Dr. Agrawal's research work product, implicitly accusing Dr. Agrawal of theft, adversely influencing his potential employers, and unjustifiably delaying the transfer of over $100,000 in grant-funded laboratory equipment for over six months that Dr. Agrawal could otherwise use to advance his cancer research under the terms of his U.S. Government grant.

52. GMU's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Dr. Agrawal, and have caused Dr. Agrawal permanent damage to his professional standing and reputation, entitling him to punitive and other non-economic damages.

53. But for Dr. Agrawal's support and assistance with his colleague's complaint of sex and racial discrimination, Dr. Agrawal would have been granted tenure and remained an employee of GMU.

## COUNT II – Breach of Contract

54. Paragraphs 1 through 53 above are hereby incorporated and restated herein.

52. Dr. Agrawal entered into an enforceable employment contract with GMU, whereby GMU obligated itself to abide by its own policies and procedures in evaluating Dr. Agrawal's application for tenure.

53. GMU breached that agreement by repeatedly violating its own tenure review policies and procedures in order to reach a conclusion that was retaliatory in motivation – the denial of tenure and subsequent termination of Dr. Agrawal.

54. As a direct result of GMU's breach, Dr. Agrawal has suffered damages in the form of lost salary and benefits, lost opportunity, financial losses, harm to professional reputation, mental anguish and emotional distress, and other compensatory and consequential damages.

WHEREFORE Plaintiff prays that this Court enter an Order as follows:

(a) awarding Plaintiff a money judgment against Defendant equal to a sum of money reflecting the monetary value of all wages and benefits of employment lost, (estimated to trial), on account of his unlawful denial of tenure, termination, the breach of contract, and other retaliatory acts effecting future employment, in an amount not less than $500,000; and

(b) awarding Plaintiff a money judgment against Defendant representing any and all monetary losses other than wages and benefits of employment, and recoverable economic losses incurred, directly or indirectly, as a result of defendant's above-referenced violations of Title VII and the breach of contract, in an amount not less than $500,000; and

(c) awarding Plaintiff a money judgment against Defendant for punitive and/or non-economic compensatory damages in the sum of three hundred fifty thousand dollars ($350,000); and

(d) awarding Plaintiff pre-judgment and post-judgment interest, as allowable and appropriate at law, on all amounts otherwise awardable, or awarded herein; and

(e) awarding Plaintiff reasonable attorney fees, expert witness fees and costs, and other litigation-related costs incurred in prosecution hereof, pursuant to Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1988; and

(f) awarding such other and further relief as this Court finds just and appropriate in this case.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all claims so triable.

 /s/ J. Andrew Baxter
Merritt J. Green (VSB # 50995)
J. Andrew Baxter (VSB# 78275)
Hailey Breanne Render (VSB #89995)
General Counsel, P.C.
6849 Old Dominion Drive, Suite 220
McLean, Virginia 22101
Tel: 703-556-0411
mgreen@gcpc.com
abaxter@gcpc.com
*Attorneys for Plaintiff*